W. E. Cooper, S. J.,
delivered the opinion of the Court.
The original bill in this case was filed on the 81st day of August, 1858, in the Chancery Court at Pulaski, by the brothers and nephews and nieces of A. C. White, deceased; and as his heirs and distributees, against the residuary devi-sees under his will, to have the said devise, and the accompanying bequest of freedom to the testator’s slaves, declared void, and the property, including the slaves, divided among the .complainants, as in case of intestacy. The defendants being infants, a guardian ad litem was appointed for them, who filed an answer insisting upon the validity of the provisions in the will. At the September Term, 1858 of the Court, the Chancellor ordered the bill to be amended by making the slaves themselves, whose right to freedom was contested, parties' defendant, which was done accordingly, and an answer filed for them by next friend, insisting upon their right to freedom under the will. Afterwards, in the month of November, 1859, a cross-bill was filed by the defendants, to the original and amended bills, (the residuary devisees and the slaves,) setting forth all the facts in relation to the execution of the will in controversy, stating that the will had been made and published in the State of Tennessee, had been found by the original complainants among the testator’s valuable papers in his office in the town of Pulaski, and taken by them to Bolivar county, State of Mississippi, and there probated upon the ground that the domicil of the testator was in that county, when in truth the testator’s domicil at his death was in Giles county, Tennessee. The complainants to the original bill were made parties defendant to this cross-bill, and required to answer its allegations, and answers were filed accordingly. The cross-bill called for a production of the original will, and *406 asked that the original, or a copy be probated in the County Court of Giles county, and that the devises and bequests in, said will in favor of the complainants in the cross-bill, be declared valid, and enforced for their benefit. Proof was taken chiefly in regard to the domicil of the testator at his death; and, upon the hearing, the Chancellor being of opinion that the domicil of the testator was in Tennessee, and that the provisions of the will were valid by the laws of this State; dismissed the original and amended bills, and decreed in favor of the complainants in the cross-bill, from which decree the original complainants appeal to this Court.
The provisions of A. C. White’s will which are the subject of controversy, are as follows:
“After my funeral expenses are paid, and all my lawful debts paid and discharged, the residue of my estate, real and persona], I give, bequeath, and dispose of as follows, to-wit: I wish all my negroes to be set free at my death, and I do hereby will and bequeath their freedom to all my slaves, of every class and description, which I may possess and own at the time of my death, with this proviso, &c.” The proviso related to the contingency of the testator’s subsequently marrying and having children, and is immaterial in view of the eyent, the testator never having married. The will then proceeds: “It is my wish, that after my death my slaves be hired out by the persons hereinafter mentioned, for the space of one year, or until a sufficient sum accrues from such hiring to meet the expenses of their transportation to Africa, and secure their support for the space of six months after their arrival in that country.” The will then, after giving certain lands in Texas to two of the testator’s brothers, proceeds thus:
“I give,bequeath and devise all the rest, residue and remainder of my real and personal estate, including all I may die seized and possessed of, together with all legal and equitable interests in all goods, chatties, lands or other estate, with the sole and exclusive right to bring suits for such interest, and enjoy the fruits thereof, to represent me as fully and entirely and restrictively in the prosecution of all such interests and *407 enjoyments thereof, as I would if alive, to the children of my brother Alfred White, now living, or that may hereafter be born to him, to be equally divided between them, on the condition hereinafter mentioned. I thus give and bequeath all my estate, save and except my negro property and the tract of land above mentioned, to the children of my brother, Alfred White, on this condition: I wish them, after my death, either through themselves or their representatives, to hire out all my slave property, with the exception of a woman named Nancy, now aged about twenty-two years, for the space of one year, or longer if necessary, in order to raise a fund to transport them to the western coast of Africa, and support them for six months after reaching there; and I wish a sufficient sum to be advanced from the moneys that may be on hand at the time of my death, or be earliest collected, to transport the above named tvoman, Nancy, immediately to Africa, with funds sufficient to support her for one year after her arrival there; it being my will that she be not hired outwith the balance of my negroes, but in the manner above specified, sent immediately to Africa. Now, if the said children of Alfred White should refuse to exercise said superintendence in the removal of my slaves to Africa, after my death, then, in the event of such refusal, it is my will that they receive no portion whatever of my property, but that the above bequests to them be null and void.” The testator then, in the event of such refusal, expresses his wish to be that the Clerk of the County Court of Giles county, or of whatever county the negroes may be located in at the time of his death, should execute the provisions in behalf of his negroes, and that the property bequeathed to the children of A. White should go to such Clerk.
This will was duly executed by the testator on the 10th day of January, 1857, in the town of Pulaski, and published in the presence of four witnesses, who subscribed the same as attesting witnesses. The testator was then a resident citizen of Giles county, Tennessee, having his domicil in the town of Pulaski, where he had lived many years, in an office which he *408 then owned, and continued to own up to his death. He subsequently, on the 29th of October, 1857, departed this life, in Bolivar county, State of Mississippi, under the circumstances hereinafter mentioned, and his will was found by his brothers, the original complainants, or some of them, among other papers,, in the office in Pulaski. The will was by them sent to Bolivar county, Mississippi, and, on the 15th day of July, 1858, was presented to the Probate Court of that county, upon the petition of one James Buford, for probate. A commission to take the depositions of the attesting witnesses in 'Tennessee, was issued by that Court, and upon the proof thus taken, on the 19th of April, 1858, .the will was admitted to record, and James Buford appointed administrator, with the will annexed. Afterwards, upon petition to that Court, by the brothers of A. C. White, deceased, to which the residuary devisees under the will were made parties by publication, they being non-residents of that State, and residents of Giles county, Tennessee, the provisions of the will now in controversy were pronounced null and void as contrary to the laws of Mississippi, and the property in that State embraced under such devise, including the negroes in the county of Bolivar, were directed to be divided and allotted according to the statutes of descents and distributions in that State. At the August Term, 1858, of the County Court of Giles county, a duly authenticated copy of the testator’s will was presented to that Court by A. C. W. White, one of the testator’s brothers, and the same was ordered by the Court to be filed and recorded, and the said A. C. W. White was duly appointed and qualified as administrator, with the will annexed, upon said estate. Shortly thereafter the original bill in this cause was filed.
It is conceded in the argument made to this Court on behalf of the original complainants, that if the domicil of the testator was in the State of Tennessee at the time of his death, the devises and bequests in controversy would be valid. In fact, this result could not be seriously controverted, in view of the repeated decisions of this Court upon similar *409 testamentary provisions. But it is insisted that the testator’s domicil -was, at his death, in Bolivar county, Mississippi, and that, by the laws of that State, such provisions are absolutely void, and the property descends and is to be distributed according to law — that the will being void as to these provisions in the State of the testator’s domicil, would be equally void, as to his personal property, in every other State. And we are referred to Miss. Rev. Code, p. 236, § 3; 30 Miss. Rep. 308; 32 Ib. 297, and other authorities. The case has been very ably and elaborately argued by the counsel who addressed the court, and who have filed briefs, and every information has been given w-hich industry and ability could afford. The point most dwelt on, and which it becomes very important to ascertain, is the place of the testator’s domicil at his death.
The difficulty of giving a definition of domicil which will apply to all cases, has been often the subject of remark by Judges and writers on international law. The beautiful definition of the civil law is as unexceptionable as any which has been attempted, if we give to the terms used a liberal trans lation to adapt them to the circumstances of modem times, for it combines precision of language, with poetic imagery. A persons domicil is “ ubi quiz larem rerumque ao fortunarum summam eonstituit; unde rursus non sit discessurus, si ni-hil avocet; unde cum prof es tus est, peregrinan videtur ; quod sircdiit, peregrinan jam destilil; ” where he has his principal home and place for the enjoyment of his fortunes ; which he does not expect to leave, except for a purpose; from which when absent, he seems to himself a wayfarer; to which when he returns, he ceases to travel. And yet this definition, beautiful as it is, seems insufficient to meet all the varying phases of the actual, and the Courts have not undertaken to adopt it, or any other. Nor is a definition at all necessary. The general rules which have been laid down for ascertaining the dom-icil, are universally recognized, and have been often heretofore approved by this Court. “ Homo, residence, and business, this Court has said, are material elements in the legal idea of domicil,” Pearce v. The State, 1 Sneed, 66. ‘'Aman *410 is presumed to hold his domicil until another is obtained; and to constitute this change, the fact and intention must concur.” Layne v. Pardee, 2 Swan, 235. And see Allen v. Thomason, 11 Hum., 536. “ To constitute domicil, two things must concur; first, residence, and secondly, the intention of making it the home of the party.” Foster v. Hall & Eaton, 4 Hum., 348. These general principles, cited and admitted by the counsel on both sides, are probably sufficient to enable us to ascertain the testator’s domicil in this case, when we come to apply them to the facts developed in the record.
These facts are substantially as follows: The testator, A. C. White, was over fifty years of age at the time of his death. He was born in the State of North Carolina, but had been a resident citizen of Giles county for forty years. He had never married, and had lived for eight or ten years in an office owned by him in the town of Pulaski, taking his meals at a tavern. He was close, economical, eccentric, and reserved. He was litigous and quarrelsome, and 'had been for years embroiled with some of his nearest relations without any just cause. He had accumulated, however, a very large estate, consisting principally of money, and some seventy-five or eighty negroes, many of them valuable mechanics. He had owned a farm near the town of Pulaski, which he sold during the year 1856. After this sale, he seems to have made some efforts to purchase another place in Giles county, on which to locate his negroes, or a part of them. He, also, begun to entertain the idea of purchasing a Southern planta,tion, and spoke to one of the witnesses about employing him as an overseer. About the first of the year 1857, he appears to have hired out most of his negroes in Giles county for the year — two or three of his -mechanics with the privilege to the person hiring of keeping them from three to five years. A few of his mechanics, he seems to have taken to Memphis, and there hired them. From Memphis, he appears to have gone to Bolivar county, Miss., to look for a place ; and, upon his return home, he wrote to a gentleman in Alabama, who owned a large body of land in that county, to meet him at Elkton, and at the interview, *411 ■which, took place in May, 1857, the testator bought the lands, consisting of some seventeen hundred acres, the deeds to which were delivered to him at his office in Pulaski a week or two thereafter. Shortly after this purchase, he seems to have again visited Bolivar county, and to have gone upon the land he had bought. On the 5th of June, 1857, we find him at Memphis, giving a pass to two of his negroes hired at that place, to return to Pulaski. After this date, he returns to Pulaski, and hires che negroes who had been at Memphis, remarking to the person hiring one of them, that he could give his note for the hire when he, White, came back, and he wrote a note and left it with such person to be executed. We next find him in the State of Missouri, where he remained some weeks purchasing slaves to take to his Bolivar county place. ITe arrived at that place, with the negroes thus bought, ten in number, about the first of October. The place was in the woods, and without any improvements thereon. In the latter part of the month of October, after he had built one log cabin and commenced another, he took sick, and died upon a blanket — there being no other bed clothing nor furniture of any kind whatsoever, to use the language of the witnesses, in the" cabin. His office key, and some papers, principally bills of sale for the negroes bought in Missouri, were found upon his person. His office in Pulaski, when entered, after his death was known, contained his bedstead, bed clothing, and other articles of furniture. From one of the drawers in a bureau in this office, the will in controversy and other valuable papers were taken. The testator had, before he left Pulaski, spoken to a mechanic to re-cover his office, and he had left his board bill at the tavern unsettled.
Upon these facts, it could not seriously be argued that there was such a change oí residence “in fact and intent,” as to transfer the testator’s domicil from Tennessee to Mississippi. But, it is said, these facts, coupled with the testator’s declarations of intention to make Bolivar county his permanent place of residence, are sufficient to work this result. We do not think so, even if those declarations were far more broad *412 and unqualified than they are in reality. The domicil in Tennessee, as we have seen, would continue until another was acquired amino et facto. If the declarations relied on had been unequivocal and unvaried, and there were no rebutting evidence, only one branch of the rule would be satisfied. The intent would exist, but not the fact. How can the testator be said to have taken up his actual, permanent residence, when he was only occupying a cabin put up for his negroes, without any preparation for continued residence, when his home, such as it was, of years remained as it always had been, and when the facts demonstrated an intention to return to that home, if for no other purpose than to make such a transfer of his valuable papers and effects as constituted his “cares,” the indi-cia of the principal establishment of such a man? Undoubtedly a permanent removal from one place to another, with intent to make the latter place one’s home,"would effect a change of domicil, no matter how short may have been the actual residence. But in this case, it is clear there never was any such permanent removal. There was the animus revertendi, and the most that can be said, upon the facts supposed, is that the testator may have eventually taken up his permanent residence in Bolivar county. He had not done so at the time of his death.
In truth, however, the evidence relied on is far from satisfactory to the mind, that the testator had any fixed intent to change his domicil. It amounts, at most, to expressions of dissatisfaction with the course of affairs in Giles county, and a determination to invest his means in property elsewhere, and an inclination to spend more of his time in other places. Several of the witnesses speak of his declarations to the effect that he would hire his mechanics at Memphis or Nashville, and spend his time between Memphis and Pulaski. The evidence chiefly relied on consists of statements by witnesses of impressions produced on their minds by the language and conversation of the testator, not of the words themselves. Those impressions, it is easy to see, might be readily produced by the testator speaking favorably of his Mississippi purchase, and of *413 his intention to settle the place, and to look to it as his chief source of revenue. The proof is clear that he did not intend to carry his Tennessee negroes there immediately, whatever he might do after he had got the place fairly started. The witnesses who approach nearest to direct testimony upon the question of intent, use language which shows that the testator spoke of the place only as a future residence, for the statements referred to were all made before the testator had actually gone upon the lands with his Missouri negroes. Besides, the evidence of the testator’s direct declarations that he did not intend to make Mississippi his home, when taken in connection with actual facts as proved, is more conclusive against, than the testimony referred to is in favor of the point in controversy. We are satisfied, after a thorough examination of the record, that the testator had, in fact, no intention to change his domicil.
The result is, that there is no error in the decree of the Chancellor, and the same will he affirmed, with costs.